**STATE of Missouri, Respondent,**

v.

**Richard H. RUHR, Appellant.**

**No. KCD 27456.**

Missouri Court of Appeals,
Kansas City District.

Feb. 9, 1976.

Kevin E. Glynn, Barr, Glynn & Morris, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for respondent.

PRITCHARD, Chief Judge.

On January 21, 1974, appellant, Richard H. Ruhr, was charged in a two-count information with having committed the 'crimes of rape and sodomy, in violation of § 559.-260, RSMo 1969, and § 563.230, RSMo 1969, respectively. Trial was to the jury, which found appellant guilty on both counts and fixed punishment at 20 years imprisonment on each count. The court ordered the sentences served consecutively and this appeal followed.

From the evidence presented at trial, a jury could have found beyond a reasonable doubt that at 4:00 p. m., on Saturday, January 5, 1974, prosecutrix went to a tavern at

36th and Broadway, in Kansas City, Missouri, in hopes of finding a part-time job. There she met and talked with appellant about the job prospects at the tavern. Appellant said he knew the owner, gave her a job application, and told prosecutrix he would talk to the owner, then contact her. She gave him her phone number and then rode home with friends.

At noon on Sunday, January 6, appellant called prosecutrix and told her the owner wanted to interview her that day and said he would call her back when he was sure of the time. He called back within an hour and a half, told prosecutrix the owner would be at the tavern around 2:30 or 3:00 p. m., and told her to bring the application. When the prosecutrix arrived at 2:30 p. m., appellant let her in the front door of the tavern. No one else was present. Appellant referred to prosecutrix's ignorance of the tavern business, then suggested he show her the basement where the liquor was stored. He spent five or ten minutes showing prosecutrix the basement, then ordered her to put her hands behind her back. The prosecutrix was 5'2" tall and weighed 113 pounds. Appellant was 6' tall and weighed about 180 pounds. Appellant tied her wrists behind her back, taped her eyes, and kissed her. When the prosecutrix asked, "What kind of joke is this?" the appellant replied, "You make any sounds I am going to cut your throat out or cut your head up." Thereupon, the prosecutrix became frightened and took the threats seriously. Appellant pushed her up the stairs to the first floor, paused to get her coat, then pushed her up some more stairs to another floor and told her to do everything he told her to avoid getting hurt. He took her clothing off, and when she complained that the ropes were hurting her hands, he retied her. He asked her if she had ever sucked a man's penis, and when she said no, pushed her to her knees and put his penis in her mouth. After this act of sodomy, he sat in a chair and forced her to have intercourse with him, then forced her to lie on her coat on the floor where the forcible

intercourse was continued. At no time before or during the acts described did the prosecutrix consent to any sexual contact with appellant. Appellant untied the victim and removed the blindfold, but before he let her go, he threatened that if she told the police or anyone else about the incident, he would kill her. The prosecutrix was so frightened that appellant would follow her home that she stayed in a nearby Safeway store for half an hour before returning to her apartment about 4:40 p. m. Fearful of venereal disease after being raped and sodomized, she bathed and douched. At about 7:30 p. m., the prosecutrix called the police but did not complete the call because she was afraid the rapist might kill her if she pressed charges against him. At 11:30 p. m., she went ahead and called the police who came to her apartment and took a description of the rapist. The appellant was arrested later that night, a lineup was held, and the prosecutrix identified appellant as the man who sodomized and raped her.

■ Appellant's first assignment of error is as follows: "The trial court erred in admitting State's Exhibits 3, 4, 5 and 6 into evidence over the objection of the appellant." This is a mere abstract statement which fails to point out wherein and why the action of the trial court was error and presents nothing for review. Rule 84.04(d) is made applicable to criminal appeals by Rule 28.18; *State v. Foster,* 513 S.W.2d 657, 659[1] (Mo.App.1974); *State v. Shumate,* 516 S.W.2d 297, 300[7–11] (Mo.App.1974). The point will not be further noticed.

■ Appellant next claims that the trial court erred in not allowing him to present evidence that prosecutrix went to the tavern on the date in question seeking male companionship. He claims that had he been allowed to show this purpose in going to the tavern, he could have made out a defense of consent. Specifically, the evidence which he claims was erroneously excluded concerned the number of times the prosecutrix had been divorced and the salary she was

drawing at her place of employment. Objections to the questions were properly sustained for the following reasons: First, it is noted that the information sought by the questions was irrelevant to the issue of consent because it neither tended to prove nor disprove a quest for male companionship. Second, consent was not an issue here because the sexual contact followed threats. "[C]onsent induced by fear of personal violence is no consent," *State v. Kirkpatrick,* 428 S.W.2d 513, 517[8, 9] (Mo.1968). Third, a reading of the transcript reveals that the avowed purpose of the appellant in seeking to elicit this information was to attack her credibility as a witness by attacking her character. Witness the following dialogue: "Q. [By defense counsel] And was that your—were you divorced more than once? MR. STIGALL [Prosecutor]: I object to that, Your Honor, as irrelevant and immaterial. MR. GLYNN: *It certainly goes to the character of the witness.* THE COURT: Objection sustained. * * * MR. GLYNN [Defense Counsel]: Of course I understand the Court's ruling, but *my purpose is to go after the character of the witness in this case and it is not to deal with any specific issues as a result of this rape, and for that reason I think I can, but I understand the Court's ruling.* * * * Q. And what was your salary? MR. STIGALL: Your Honor, I object to that as irrelevant and immaterial what her salary was at H. D. Lee. THE COURT: Sustained. * * * THE COURT: Well, now, I am not really clear on what you are trying to establish by this line of testimony. You are trying to show that anything she said on, on direct examination was not true, you are trying to impeach her? MR. GLYNN: That's right. THE COURT: What did she say on cross-examination that this would impeach, that is the point. You are not questioning, you are not coming to grips with anything. MR. GLYNN: *I am coming to grips with the character of the witness.* THE COURT: What has her character got to do with this? You are well familiar with all these Missouri cases. MR. GLYNN:

*Judge, I am after the character of this witness since I am entitled to show the character of any other witnesses.* * * * MR. GLYNN: The veracity of the witness is what we are talking about. MR. STIGALL: I renew my objection that is an improper way to do that. THE COURT: Objection sustained." (All emphases supplied.)

■ In a rape prosecution in Missouri, where consent is in issue, prosecutrix's character may be attacked by evidence that her *general reputation* for morality and chastity is bad, but not by evidence of specific acts. *State v. Yowell,* 513 S.W.2d 397, 403[7, 8] (Mo. banc 1974); *State v. Kain,* 330 S.W.2d 842, 845[4][5] (Mo.1960). Similarly, as any other witness, her character may be impeached by showing that her *general reputation* for truth and veracity is bad, but not by proof of specific acts of misconduct. *State v. Taylor,* 473 S.W.2d 385, 388 (Mo. 1971). The general reputation of a person is the general opinion, whether good or bad, held of a person by those in the community in which such person resides and is necessarily based on hearsay. Black's Law Dictionary, Rev. 4th Ed., p. 1467–8.

When seen in this light, it is obvious that the questions asked do not attempt to elicit proper character evidence. They do not ask about the general reputation of prosecutrix for morality, chastity, truthfulness and veracity, but, in fact, ask about specific acts. The sustaining of the objections to these questions was eminently proper.

The third and final point is an attack on the sufficiency of the evidence. Appellant argues in support of his claim that the prosecutrix's testimony was so inconsistent and equivocal as to be void of all probative value, but appellant does not point to any internal inconsistencies in the prosecutrix's testimony and the record discloses none. The prosecutrix's testimony was neither successfully impeached nor materially contradicted. *State v. Davis,* 497 S.W.2d 204, 207[3] (Mo.App.1973).

Appellant further says, "in the present case, the delay in reporting, the statement of [the prosecutrix] that she did not know if she wanted to report it and the physical examination, the results of which were read into the record, all tended to negate the charges advanced by the state." Appellant's contention that the delay of seven hours from the time of the crime until the victim called the police destroys the state's case is without merit. A hiatus between forcible ravishment and complaint is solely a matter for jury deliberation in weighing the evidence, so long as the elapsed time is not so unreasonable that the appellate court could hold, as a matter of law, that the state's accusation was negated or contradicted. *State v. Bigley,* 247 S.W. 169, 171[5, 6] (Mo.1922); *State v. Palmer,* 344 Mo. 1063, 130 S.W.2d 599, 600[2–4] (1939). In the instant case, the seven hour delay was not unreasonable in view of the prosecutrix's testimony, believed by the jury, that appellant threatened to kill her if she told anyone about the rape and sodomy. It merely took her seven hours to allow her sense of indignation to overcome her fear of retaliation.

The final contention that a medical report showing the absence of sperm in the prosecutrix's vagina after the incident was fatal to the state's case as a matter of law is similarly without merit. Appellant has cited no authority requiring proof of ejaculation as a requisite to conviction for forcible rape. In Missouri, the essential elements of rape are: (1) penetration (however slight) of a female's sexual organs; (2) accomplished by force or threats; and (3) against the will of the woman. *State v. Robinson,* 484 S.W.2d 186 (Mo.1972); *State v. Deckard,* 426 S.W.2d 88 (Mo.1968). There was sufficient evidence of all three in the instant case, and so the submission of the case to the jury was proper.

In passing, it is noted that a similar contention was presented in the case of *People v. Wright,* 3 Ill.App.3d 829, 279 N.E.2d 398 (1972). There, the appellant, convicted of rape, argued that negative results of a vaginal swab test for sperm after the incident precluded a finding of guilty. The victim had testified that after the rape she returned to her room and douched because she feared the defendant might have some disease. The court concluded: "In view of the fact that she took sanitary measures after the rape and before the examination because of her fear of disease, a reasonable reaction for a rape victim unschooled in the intricacies of criminal investigation, the trial judge was justified in disregarding the test results as entirely inconclusive." That ruling applies here as the prosecutrix explained the absence of sperm which was occasioned by her bathing and douching.

The judgment is affirmed.

All concur.